UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | |
|---|---|
| CENTURYTEL OF CHATHAM, LLC, ET AL | CIVIL ACTION NO. 09-cv-1951 |
| VERSUS | JUDGE JAMES |
| SPRINT COMMUNICATIONS CO., LP, ET AL | MAGISTRATE JUDGE HORNSBY |

**REPORT AND RECOMMENDATION**

**Introduction**

The CenturyLink Plaintiffs operate local telephone network facilities across the country. They allege that defendant Sprint has refused to pay more than $6.4 million in fees required by federal and state telecommunications tariffs for the use of the CenturyLink local telephone network facilities by Sprint's long distance customers. The heart of the dispute is the proper rate Sprint must pay when its customers originate voice calls using Voice-over-Internet Protocol ("VoIP") technology. The CenturyLink Plaintiffs contend that those calls are subject to the same tariff rates as ordinary telephone calls. Sprint contends the VoIP-originated long distance traffic falls outside of traditional tariffs and should be billed at the rate applicable to information services rather than communications services.

Before the court is Sprint's Motion to Dismiss Count II and Refer the Other Counts to the Federal Communications Commission ("FCC") (Doc. 11). It is recommended, for the reasons that follow, that the motion be granted.

**Relevant Facts**

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 127 S.Ct. 2197, 2200 (2007). Accordingly, a fair summary of the allegations in the complaint, as well as some undisputed background facts, will be set forth below.

Before the Telecommunications Act of 1996, telephone service in a local calling area was provided by a single local exchange carrier, operating as a state-licensed monopoly. The CenturyLink Plaintiffs are such incumbent local carriers. The 1996 Act ended the monopoly and opened local telephone markets to competition. The Act required incumbent local carriers to share their networks and services, for reasonable rates and terms, with other carriers.

Sprint must pay local exchange carriers such as the CenturyLink Plaintiffs to compensate them for its use of local exchange facilities for originating and terminating long distance calls. If such a call is between a calling party and a called party who are located in different states or different countries, Sprint must pay the CenturyLink Plaintiffs an access fee governed by Federal Access Tariffs that are on file with the FCC. If the calling party and called party are located in the same state, Sprint must pay the CenturyLink Plaintiffs an access fee in accordance with State Access Tariffs on file with applicable state regulatory commissions. Complaint, ¶¶ 3, 4, and 28.

For several years before August 2009, Sprint paid the rates contained in the Federal and State Access Tariffs without protest and without distinction based on transmission technology or the originating traffic. Beginning in August 2009, however, Sprint refused to pay the rates in the Access Tariffs on VoIP-originated traffic that terminated over the CenturyLink Plaintiffs' facilities. Rather than pay the rates set forth in the Access Tariffs, Sprint began paying a much lower rate of $.0007 per minute. (Sprint states in a memorandum that this is the rate the FCC imposes for dial-up internet calls.) Sprint also began to withhold payments for services about which it raised no dispute, as a form of self-help recovery retroactive to August 2007 of the overpayments Sprint believed it had made for such VoIP-originated calls. ¶¶ 7-9. The total payments for Access Tariff rates that Sprint has refused to pay exceed $6.4 million at the end of October 2009. The amount of withheld access payments continues to grow with each monthly invoice. ¶¶ 11-12.

The services provided by the CenturyLink Plaintiffs under the Access Tariffs are the same regardless of the transmission protocol. Whether the Sprint customer chooses to originate a call via VoIP or Time Division Multiplexing ("TDM") (which are ordinary voice calls), the call enters the CenturyLink Plaintiffs' network at the Sprint point of presence ("POP") as TDM and uses the CenturyLink Plaintiffs' network in exactly the same manner. ¶ 34. The network elements, the functions that each element performs, and the manner in which it is used are not dependent on the originating transmission protocol. A VoIP-originated call and a TDM-originated call traverse the same path, in the same manner, and

use the same network elements when the call is terminated through the CenturyLink Plaintiffs' network. At the point the calls enter the CenturyLink Plaintiffs' network, the two forms of calls are indistinguishable to the CenturyLink Plaintiffs. ¶ 35.

The complaint also alleges at paragraph five that the Access Tariffs apply to all voice calls terminating to the CenturyLink Plaintiffs' networks regardless of whether the method of transmission used to originate the call is TDM technology or VoIP technology. This, however, is a legal conclusion and the issue at the heart of the case. Legal conclusions, unlike facts, need not be accepted as true for Rule 12(b)(6) purposes. Beavers v. Metropolitan Life Ins. Co. 566 F.3d 436, 439 (5th Cir. 2009). The parties appear to agree that the FCC has not definitively decided whether VoIP-originated traffic should be categorized as "information service" or "telecommunications service" for rate purposes.

**Count II; Violation of Section 251(g) of Communications Act**

Counts I and IV of the Complaint allege that Sprint violated the requirements of Federal and State Access Tariffs. Count III alleges that Sprint's unilateral readjustment of the rates it pays for VoIP traffic violates 47 U.S.C. § 201, a provision of the Communications Act that requires carriers to be "just and reasonable in their practices in connection with communication services." Count II alleges that Sprint has violated 47 U.S.C. § 251(g) by not paying the rates required in the Access Tariffs. Sprint attacks Count II for failure to state a claim on which relief may be granted.

Section 251 is part of the 1996 legislation that opened up local telecommunications markets to competition from other service providers. The statute imposes the general duty on local exchange carriers to interconnect with facilities and equipment of other carriers. It also imposes on local exchange carriers obligations regarding access to rights of way, number portability, and other matters designed to foster participation of others in the marketplace. Subsection (g) of the statute then provides as follows:

> On and after February 8, 1996, each local exchange carrier [such as CenturyLink], to the extent that it provides wireline services, shall provide exchange access, information access, and exchange services for such access to interexchange carriers and information service providers [such as Sprint] in accordance with the same equal access and nondiscriminatory interconnection restrictions and obligations (including *receipt of compensation*) that apply to such carrier on the date immediately preceding February 8, 1996 under any court order, consent decree, or regulation, order, or policy of the Commission, until such restrictions and obligations are explicitly superseded by regulations prescribed by the Commission after February 8, 1996. During the period beginning on February 8, 1996 and until such restrictions and obligations are so superseded, such restrictions and obligations shall be enforceable in the same manner as regulations of the Commission. [Italics added.]

CenturyLink argues that the "receipt of compensation" language in the statute gives rise to a statutory obligation that Sprint pay access charges to CenturyLink. The parties have not cited any jurisprudence that has specifically held whether or not Section 251(g) creates a private right of action in these circumstances. CenturyLink argues that for every right there must be a remedy, and not reading a remedy into the statute would eviscerate its right to receipt of compensation.

The question whether a statute creates a cause of action either expressly or by implication, is a matter of statutory construction. The court's task is to interpret the words of Congress to determine whether they display an intent to create not just a private right but also a private remedy. The statute must do so in "clear and unambiguous terms." Delancey v. City of Austin, 570 F.3d 590, 593 (5th Cir. 2009).

Section 251(g) was discussed in a case in which the FCC invoked the statute's reference to "information access" as a basis for the agency to issue regulations regarding local calls made to internet service providers. A court rejected the FCC's position because the statute "is worded simply as a transitional device, reserving various LEC [Local Exchange Carrier] duties that ante-dated the 1996 Act until such time as the Commission should adopt new rules pursuant to the Act." WorldCom, Inc. v. FCC, 288 F.3d 429, 430 (D.C. Cir. 2002).

Section 251(g) primarily targets the local exchange carrier such as CenturyLink and requires it to provide the access it provided prior to the 1996 legislation. There is nothing in the transitional provision that clearly and unmistakably creates a right for a local exchange carrier to sue under the statute regarding the parenthetically referenced right to receipt of compensation for services. Accordingly, the undersigned recommends that the court find no cause of action in favor of CenturyLink stemming from Section 251(g). This does not mean that CenturyLink is without a remedy for claims to compensation. CenturyLink may pursue relief under the tariffs, as it has done in other parts of its complaint.

**Primary Jurisdiction Doctrine**

The doctrine of primary jurisdiction applies when a government agency such as the FCC has exclusive jurisdiction over an issue or when a court that has jurisdiction wishes to defer to the agency's superior expertise. The doctrine is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. It applies where a claim is originally cognizable in the courts, but enforcement of the claim requires the resolution of issues which, under a regulatory scheme, fall within the special competence of an administrative body. U.S. v. Western Pac. R.R. Co., 77 S.Ct. 161, 165 (1956).

If the court wishes to defer, the judicial process is suspended pending referral to the administrative body for its views. If, however, the issues before the court can be resolved by using the plain language of the tariffs and the ordinary rules of construction, the court should decide the case without referral to the agency. See North Winds Abatement, Inc. v. Employers Insurance of Wausau, 69 F.3d 1304, 1309 (5th Cir. 1995); Southwestern Bell Telephone Company v. Fitch, 643 F.Supp. 2d 902, 912 (S.D. Tex. 2009).

There is no "fixed formula" for applying the doctrine of primary jurisdiction, but "the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." Western Pac. R.R. Co., 77 S.Ct. at 165. Courts examine a variety of factors to determine whether primary jurisdiction warrants referral to the FCC, with the factors often including: (1) whether the

question is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made. 6 Business and Commercial Litigation in Federal Courts § 73:41(2d ed.). If these factors point toward referral, but they are outweighed by the burdens of referral, such as additional cost and delay, a court may choose not to apply the doctrine. Id.

In practice, a "referral" means that the court either stays the case or dismisses it without prejudice, so that the parties may seek an administrative ruling. There is no formal transfer of the case. Rather, the parties are responsible for initiating administrative proceedings themselves. Clark v. Time Warner Cable, 523 F.3d 1110, 1115 (9th Cir. 2008), citing Reiter v. Cooper, 113 S.Ct. 1213 (1993).

CenturyLink argues that this case is readily capable of decision by a court. It urges that regardless of how a call originates and is transmitted, the termination services ordered by Sprint and provided by CenturyLink are the same. CenturyLink's argument appeals to logic and fairness but avoids the language of the actual federal and state tariffs that govern. Sprint responds that the language of the several tariffs at issue must be examined, and the FCC has not definitively decided whether VoIP-originated traffic should be billed at the same rate as telecommunications services under the tariffs.

CenturyLink presents the case as being simple, but a review of the competing briefs show that the legal and regulatory framework at issue is quite complex. The agency would be in a much better position than the court to take into consideration any policy and system-wide economic issues associated with the issue in this case. The agency is also better equipped to avoid a pronouncement about this dispute that might have unintended consequences in other cases or situations. If the court decides the dispute, there is a danger the court's ruling would be inconsistent with the rulings of other courts or decisions within the agency, lending further confusion to an already complex dispute.

The parties have not pointed to a prior application to the FCC that presents this identical dispute, but Sprint does point to other VoIP classification questions that have been presented to the FCC. They include the question of whether a VoIP provider is subject to an anti-slamming statute that applies to "telecommunications carriers." Clark, 523 F.3d at 1112-13. The FCC has also solicited comment on whether VoIP services should be classified as telecommunication services or information services under the Act. CenturyLink discounts the importance of this and offers that it has been several years since the FCC began looking into the issue. Conversely, this court would likely be able to resolve this particular dispute relatively quickly by setting a trial.

The parties cite competing decisions in which district courts have elected to refer or not refer matters to the FCC, but none of the cited cases is on all fours with the facts of this case. Furthermore, the court must exercise its discretion in connection with the primary

jurisdiction doctrine, which lessens the impact of other decisions and requires focus on the particular facts before the court. The undersigned has reviewed the competing arguments and materials and finds, after a review of all relevant factors, that the best exercise of the court's discretion in these circumstances would be to stay this case, refer the remaining counts of the complaint to the FCC, and close this civil action for administrative purposes.

A court will sometimes place a time limit on its stay, signaling that it may go forward with the adjudication of the issues if the FCC has not decided the matter or made substantial progress by the expiration of the stay. 6 <u>Business and Commercial Litigation in Federal Courts</u> § 73:41, n.14. The undersigned does not recommend placing a particular time limit on the stay. Rather, the court should direct that if any party, after one year, is not satisfied that the FCC has made substantial progress toward deciding the matter, the party may file with the court a report of the agency proceedings and request that the stay be lifted. This will give the FCC a first and reasonable opportunity to address the issue at the heart of this case. If, however, it appears after one year that it will take an unreasonable amount of time for the agency to reach the issue, the balance of factors in favor of a stay may change.

Accordingly,

**IT IS RECOMMENDED** that Sprint's **Motion to Dismiss Count II and Refer the Other Counts to the FCC (Doc. 11)** be **granted** by (1) dismissing Count II for failure to state a claim on which relief may be granted and (2) staying all other counts in the complaint so that the matter may be presented to the FCC.

**IT IS FURTHER RECOMMENDED** that if any party, after one year, is not satisfied that the FCC has made substantial progress toward deciding the matter, the party be allowed to file with the court a report of the agency proceedings and request that the stay be lifted.

**Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within seven (7) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 15th day of December, 2010.

_____
MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE